**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **CINDY CARTWRIGHT,**<br>individually and<br>on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**NSC HOLDINGS, LLC d/b/a/ NSC TECHNOLOGIES,**<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Cindy Cartwright, individually and on behalf of all similarly situated persons, alleges the following against NSC Technologies ("NSC" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Plaintiff brings this class action against NSC for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former employees' and job applicants' ("Class Members" defined below) personally

identifiable information ("PII") from hackers. According to the company, this information may have included the names and Social Security numbers (the "Private Information") for at least 48,531 of Class Members.[1]

2. On or around June 26, 2023, NSC discovered a data security incident through which an unauthorized actor gained access to NSC's network and accessed files on its computer systems between June 19, 2023, and June 20, 2023 (the "Data Breach"). Through the Data Breach, the cybercriminals were able to access current and former employees' and job applicants' Private Information.

3. As a result of the Data Breach, Plaintiff and Class Members have experienced and/or are at a substantial and imminent risk of experiencing identity theft and various other forms of personal, social, and financial harm. This risk will remain for their respective lifetimes.

4. The Private Information compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves, including but not limited to, Social Security numbers that NSC collected from its employees and job applicants and maintained in its systems. Compounding the damage done by the Data Breach, NSC failed to notify affected Class Members until nearly *five months* after it discovered the Data Breach.

---

[1] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/e34fc0e2-8679-48f7-bb00-62a0c608a4b2.shtml (last visited on Dec. 13, 2023).

5. Armed with the Private Information accessed in the Data Breach, and a head start, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits and/or medical services, and filing fraudulent tax returns using Class Members' information.

6. There has been no assurance offered by NSC that all personal data or copies of data have been recovered or destroyed, or that it has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

7. Therefore, Plaintiff and Class Members are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of identity theft and other fraudulent misuse of their Private Information, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

8. Plaintiff brings this class action lawsuit to address NSC's inadequate safeguarding of her and Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and

Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

9. The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to NSC, and thus NSC was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

10. Plaintiff's and Class Members' identities are now at risk because of NSC's negligent conduct because the Private Information that NSC collected and maintained is now in the hands of data thieves and other unauthorized third parties.

11. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

12. Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, invasion of privacy, breach of implied contract, unjust enrichment, and declaratory judgment.

## II. PARTIES

13. Plaintiff Cindy Cartwright is an individual citizen of the State of Virginia.

14. Defendant is incorporated in Delaware with its principal place of business located at 1200 Ashwood Parkway, Suite 590, Atlanta, Georgia, in Fulton County.

15. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, including the named members of the Defendant LLC who are only known to Defendant and who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known, including the members of the LLC.

## III. JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from NSC. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

17. This Court has jurisdiction over NSC because NSC is incorporated and conducts business in this District.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because NSC resides in this District and is being served in this District.

## IV. FACTUAL ALLEGATIONS

### *A. NSC's Business and Collection of Plaintiff's and Class Members' Private Information*

19. Founded in 2000, NSC is a nationwide staffing company that provides workforce solutions to a variety of industrial and technical industries. Upon information and belief, NSC has nearly 30 offices nationwide, employs 162 people, and generates approximately $19.1 million in annual revenue.

20. As a condition of employment with NSC, Defendant requires that its employees and job applicants entrust it with highly sensitive personal information. In the ordinary course of employment with NSC, Plaintiff and Class Members were required to provide their Private Information to Defendant.

21. Because of the highly sensitive and personal nature of the information NSC acquires and stores with respect to its employees and job applicants, NSC, upon information and belief, promises to, among other things: keep employees' and applicants' Private Information private; comply with industry standards related to data security and the maintenance of its employees' and applicants' Private Information; inform them of NSC's legal duties relating to data security and comply with all federal and state laws protecting their Private Information; only use and release employees' and applicants' Private Information for reasons that relate to the services it provides; not store employes' and applicants' Private Information for longer than is necessary to carry out its business operations; and provide adequate

notice to its current and former employees and applicants if their Private Information is disclosed without authorization.

22. By obtaining, collecting, using, and deriving a benefit from its employees' and applicants' Private Information, NSC assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

23. Plaintiff and Class Members relied on NSC to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

### *B. The Data Breach and Defendant's Inadequate Notice to Plaintiff and Class Members*

24. In a data breach notice letter that went out to all impacted NSC current and former employees and applicants on or around November 21, 2023 (the "Notice"), Defendant reported that it learned of unauthorized access to its computer systems approximately *five months* earlier on or around June 26, 2023. Based upon the company's investigation, it discovered that the Data Breach was the result of an attack on its systems that allowed an "unauthorized actor" to gain access to its systems and ultimately access copies of Plaintiff's and Class Members' Private Information. It is clear that the data thieves carried out this attack in order to either

use the Private Information themselves for nefarious purposes, or to sell it on the dark web.

25. Thus, through the Data Breach, the unauthorized cybercriminal(s) accessed and exfiltrated a cache of highly sensitive Private Information, including NSC's employees' Social Security numbers.

26. NSC had obligations created by contract, industry standards, and common law to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

27. Plaintiff and Class Members provided their Private Information to NSC with the reasonable expectation and mutual understanding that NSC would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

28. NSC's data security obligations were particularly important given the substantial increase in cyberattacks carried out against employers in recent years.

29. NSC knew or should have known that its electronic records would be targeted by cybercriminals, yet it failed to take the necessary precautions to protect Plaintiff's and Class Members' Private Information from being compromised.

30. In response to its admitted failure to safeguard Plaintiff's and Class Members' Private Information, NSC's response is particularly paltry. In its Notice, Defendant offered Plaintiff just 24 months of credit monitoring.

### *C. NSC Failed to Comply with FTC Guidelines*

31. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

32. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

33. The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

34. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

35. As evidenced by the Data Breach, NSC failed to properly implement basic data security practices. NSC's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information evidences its negligent failure to comply with the standards set forth by Section 5 of the FTCA.

36. NSC was at all times fully aware of its obligation to protect the Private Information of its current and former employees yet failed to comply with such

obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *D. NSC Failed to Comply with Industry Standards*

37. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect from current and former employees and maintain.

38. Some industry best practices that should be implemented by businesses like NSC include, but are not limited to, educating all employees, implementing strong password requirements, implementing multilayer security including firewalls, implementing anti-virus and anti-malware software, encrypting highly sensitive data, implementing multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow at least some, or perhaps all of, these industry best practices.

39. Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

40. Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

41. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### *E. NSC Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information*

42. In addition to its obligations under federal and state laws, NSC owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. NSC owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of its current and former employees.

43. NSC breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and

safeguard its computer systems and data. NSC's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect current and former employees' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

e. Failing to adhere to industry standards for cybersecurity as discussed above; and

f. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

44. NSC negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information and exfiltrate such Private Information.

45. Had NSC remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures

recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

46. Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft.

### ***F. NSC Should Have Known that Cybercriminals Target PII to Carry Out Fraud and Identity Theft***

47. The FTC hosted a workshop to discuss "informational injuries," which are injuries that current and former employees like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[2] Exposure of highly sensitive personal information that individuals to keep private may cause harm to them, such as the ability to obtain or keep employment. Individuals' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

---

[2] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Dec. 14, 2023).

48. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

49. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

50. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined

with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

51. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

52. One such example of this is the development of "Fullz" packages.

53. Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

54. The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz

package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

55. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[3] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

56. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card

---

[3] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited on Dec. 14, 2023).

in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

57. A study by the Identity Theft Resource Center[4] shows the multitude of harms caused by fraudulent use of PII:




58. Indeed, a robust cyber black market exists in which criminals openly post stolen PII on multiple underground Internet websites, commonly referred to as the dark web.

59. The value of such highly sensitive information is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves

---

[4] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited April 27, 2023).

attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that PII has considerable market value.

60. It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[5]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

61. PII is a valuable commodity to identity thieves because once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

62. As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future and have no choice but to vigilantly monitor their accounts and purchase credit monitoring and identity theft protection for many years to come.

---

[5] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited May 25, 2023).

### *G. Plaintiff's and Class Members' Experience and Resulting Damages*

*Plaintiff Cindy Cartwright's Experience*

63. Plaintiff Cartwright is a former employee of NSC. She began her employment in or around August 2021 and was an employee of NSC through July 2023. As a condition of employment with Defendant, Plaintiff Cartwright was required to give her Private Information to Defendant.

64. Plaintiff Cartwright is very careful about sharing her Private Information. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Cartwright stores any documents containing her sensitive PII in a safe and secure location or destroys the documents.

65. Plaintiff Cartwright only allowed Defendant to maintain, store, and use her Private Information because she believed that Defendant would use basic, industry standard data security measures, such as those set forth herein, to protect it from unauthorized access.

66. Plaintiff Cartwright received the Notice of Data Breach on or around November 21, 2023, stating, in relevant part, that her name and Social Security number were disclosed in the Data Breach.

67. Plaintiff and Class Members are now at an imminent, immediate, and continuing increased risk of experiencing devastating instances of identity theft, including but not limited to, having loans opened in their names, tax returns filed in

their names, utility bills opened in their names, credit card accounts opened in their names, unauthorized charges made on their financial accounts, and other forms of identity theft.

68. Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to continue to carry out such targeted schemes against Plaintiff and Class Members.

69. The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which has been and will continue to be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

70. Further, as a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach. Specifically, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying

financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

71. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

72. Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[6] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[7]

73. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.

[6] *See* https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited on Dec. 14, 2023).

[7] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited on Dec. 14, 2023).

Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

74. Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

75. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of NSC, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

76. As a direct and proximate result of NSC's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V. CLASS ACTION ALLEGATIONS

77. Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

78. Specifically, Plaintiff proposes the following Nationwide Class (referred to herein as the "Class"), subject to amendment as appropriate:

> **Nationwide Class**
>
> **All individuals in the United States who were impacted by the Data Breach, including all who were sent a notice of the Data Breach.**

79. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

80. Plaintiff reserves the right to modify or amend the definitions of the proposed Nationwide Class or add subclasses before the Court determines whether certification is appropriate.

81. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

82. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of at least 48,531 employees and job applicants of NSC whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through NSC's records, Class Members' records, publication notice, self-identification, and other means.

83. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether NSC engaged in the conduct alleged herein;

b. When NSC learned of the Data Breach;

c. Whether NSC's response to the Data Breach was adequate;

d. Whether NSC unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

e. Whether NSC failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f. Whether NSC's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether NSC's data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether NSC owed a duty to Class Members to safeguard their Private Information;

i. Whether NSC breached its duty to Class Members to safeguard their Private Information;

j. Whether hackers exfiltrated Class Members' Private Information via the Data Breach;

k. Whether NSC had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

l. Whether NSC breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

m. Whether NSC knew or should have known that its data security systems and monitoring processes were deficient;

n. What damages Plaintiff and Class Members suffered as a result of NSC's misconduct;

o. Whether NSC's conduct was negligent;

p. Whether NSC was unjustly enriched;

q. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

r. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

84. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

85. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

86. Predominance. NSC has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from NSC's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

87. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for NSC. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

88. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). NSC has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

89. Finally, all members of the proposed Class are readily ascertainable. NSC has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by NSC.

## CLAIMS FOR RELIEF

## COUNT I
## NEGLIGENCE
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

90. Plaintiff restates and realleges the allegations in paragraphs 1-89 as if fully set forth herein.

91. NSC knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, and stolen by unauthorized parties.

92. NSC knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. NSC was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

93. NSC owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. NSC's duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect current and former employees' and job applicants' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTCA and applicable industry standards;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To precisely disclose the type(s) of information compromised.

94. NSC's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

95. NSC's duty also arose because Defendant was bound by industry standards to protect its current and former employees' confidential Private Information.

96. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and NSC owed them a duty of care not to subject them to an unreasonable risk of harm.

97. NSC, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within its possession.

98. NSC, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

99. NSC breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
b. Failing to adequately monitor the security of its networks and systems;
c. Allowing unauthorized access to Class Members' Private Information;
d. Failing to comply with the FTCA and applicable industry standards;

e. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

100. NSC had a special relationship with its current and former employees, including Plaintiff and Class Members.

101. Plaintiff's and Class Members' willingness to entrust NSC with their Private Information was predicated on the understanding that NSC would take adequate security precautions to protect it. Moreover, only NSC had the ability to protect its systems (and the Private Information stored thereon) from attack.

102. NSC's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein and admitted by Defendant in its Notice to Plaintiff and Class Members.

103. NSC's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

104. As a result of NSC's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in

that their Private Information, which is still in the possession of criminal third parties, has been and will continue to be used for fraudulent purposes.

105. NSC also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information.

106. As a direct and proximate result of NSC's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

107. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

108. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

109. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring NSC to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
## INVASION OF PRIVACY
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

110. Plaintiff restates and realleges the allegations in paragraphs 1-89 as if fully set forth herein.

111. Plaintiff and Class Members maintain a privacy interest in their Private Information, which is highly sensitive, confidential information that is also protected from disclosure by applicable laws and industry standards, as set forth above.

112. Plaintiff's and Class Members' Private Information was contained, stored, and managed electronically in Defendant's records, computers, and databases and was intended to be secured from unauthorized access to third-parties because highly sensitive, confidential matters regarding Plaintiff's and Class Members' identities were only shared with Defendant for the limited purpose of obtaining employment.

113. Additionally, Plaintiff's and Class Members' Private Information is highly attractive to criminals who can nefariously use such Private Information for fraud, identity theft, and other crimes without the victims' knowledge and consent.

114. Defendant's disclosure of Plaintiff's and Class Members' Private Information to unauthorized third parties by allowing such parties to gain access to its network resulted from Defendant's failure to adequately secure and safeguard Plaintiff's and Class Members' Private Information. Such failure was the direct and proximate cause of unauthorized intrusions into Plaintiff's and Class Members' places of solitude and seclusion that are highly offensive to a reasonable person.

115. Such exploitation of Plaintiff's and Class Members' Private Information was done for Defendant's business purposes.

116. NSC's unauthorized disclosure of Plaintiff's and Class Members' Private Information to criminal third parties permitted the electronic intrusion into private quarters where Plaintiff's and Class Members' Private Information was stored.

117. Plaintiff and Class Members have been damaged by NSC's conduct, including by incurring the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

118. Plaintiff restates and realleges the allegations in paragraphs 1-89 as if fully set forth herein.

119. NSC provided employment to Plaintiff and Class Members.

120. Defendant, as employer and staffing company, held the Private Information on behalf of Plaintiff and Class Members. Holding Plaintiff and Class Members' Private Information was part of Defendant's regular business practices, as agreed by the parties. When Plaintiff and Class Members joined Defendant's employment, they agreed to have their Private Information stored in Defendant's network.

121. Plaintiff and Class Members entered implied contracts with Defendant in which Defendant agreed to safeguard and protect such Information and to timely

detect any breaches of their Private Information. Plaintiff and Class Members were required to share Private Information to obtain employment. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

122. Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

123. Defendant's implied promises to Plaintiff and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

124. Defendant breached these implied promises it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to notify Plaintiff and Class Members thereof within a reasonable time.

125. Plaintiff and Class Members would not have entrusted their Private Information to NSC in the absence of such an implied contract.

126. Had NSC disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices in place to secure such sensitive data, Plaintiff and Class Members would not have provided their Private Information to NSC.

127. NSC recognized that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

128. NSC violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

129. Plaintiff and Class Members have been damaged by NSC's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

130. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and

monitoring procedures; and (iii) immediately provide free lifetime credit monitoring to all Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

131. Plaintiff restates and realleges the allegations in paragraphs 1-89 as if fully set forth herein.

132. This Count is pleaded in the alternative to Count III above.

133. Plaintiff and Class Members conferred a benefit on Defendant. Specifically, they provided Defendant with their Private Information, which Private Information has inherent value. In exchange, Plaintiff and Class Members should have been entitled to have Defendant protect their Private Information with adequate data security, especially in light of their employer-employee relationship.

134. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff and Class Members' Private Information for business purposes.

135. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

136. Defendant acquired the Private Information through inequitable record retention as it failed to disclose the inadequate security practices previously alleged.

137. If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to secure their Private Information, they would have made alternative employment choices that excluded Defendant.

138. Plaintiff and Class Members have no adequate remedy at law.

139. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

140. As a direct and proximate result of NSC's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the imminent and substantial risk of actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity

theft; (vi) the continued risk to their Private Information, which remains in NSC's possession and is subject to further unauthorized disclosures so long as NSC fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

141. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from NSC and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by NSC from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

142. Plaintiff and Class Members may not have an adequate remedy at law against NSC, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT V
## DECLARATORY JUDGMENT
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

143. Plaintiff restates and realleges the allegations in paragraphs 1-89 as if fully set forth herein.

144. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and common law described in this Complaint.

145. NSC owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

146. NSC still possesses Private Information regarding Plaintiff and Class Members.

147. Plaintiff alleges that NSC's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her Private Information and the risk remains that further compromises of her Private Information will occur in the future.

148. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. NSC owes a legal duty to secure its current and former employees' Private Information from unauthorized disclosure and theft;

b. NSC's existing security measures do not comply with its implicit contractual obligations and duties of care to provide reasonable security

procedures and practices that are appropriate to protect current and former employees' Private Information; and

c. NSC continues to breach this legal duty by failing to employ reasonable measures to secure current and former employees' Private Information.

149. This Court should also issue corresponding prospective injunctive relief requiring NSC to employ adequate security protocols consistent with legal and industry standards to protect current and former employees' Private Information, including the following:

a. Order NSC to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members; and

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, NSC must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on NSC's systems on a periodic basis, and ordering NSC to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of NSC's systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

vii. routinely and continually purging all former employee data that is no longer necessary in order to adequately conduct its business operations; and

viii. meaningfully educating its current and former employees about the threats they face with regard to the security of their Private Information, as well as the steps NSC's current and former employees should take to protect themselves.

150. If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at NSC. The risk of another such breach is real, immediate, and substantial. If another breach at NSC

occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

151. The hardship to Plaintiff if an injunction does not issue exceeds the hardship to NSC if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of NSC's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and NSC has a pre-existing legal obligation to employ such measures.

152. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at NSC, thus preventing future injury to Plaintiff and other current and former employees whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing NSC to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring NSC to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses pursuant to O.C.G.A. Section 13-6-11, and as otherwise allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all triable issues.

DATED: December 18, 2023. Respectfully submitted,

By: */s/ MaryBeth V. Gibson*
MaryBeth V. Gibson
Georgia Bar No. 725843
N. Nickolas Jackson
Georgia Bar No. 841433
**THE FINLEY FIRM, P.C.**
3535 Piedmont Road
Building 14, Suite 230
Atlanta, GA 30305
Telephone: (678) 642-2503
mgibson@thefinleyfirm.com
njackson@thefinleyfirm.com

Mason Barney (*pro hac vice* to be filed)
Tyler Bean (*pro hac vice* to be filed)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: tbean@sirillp.com

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 14-point Times New Roman font in accordance with Local Rule 5.1(C).

Dated: December 18, 2023.

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson